My client is a small maker of energy drinks called Jacked Up. It entered into an eight-year licensing agreement with what was at the time the third largest player in the coffee and tea business in America, Sara Lee. Under this eight-year license agreement, Sara Lee would distribute Jacked Up's energy-infused teas and coffees to tens of thousands of convenience stores nationwide. It was set to be a multi-year agreement. However, just three weeks into this multi-year agreement, Sara Lee, acting at the behest of an even larger food conglomerate, Smucker, breached and repudiated this license agreement with Jacked Up. Now, naturally, this wrongful conduct by Sara Lee and Smucker gave rise to a market basket of contract tort claims against both brought by Jacked Up. Judge Lindsey disposed of each and every one of these claims in a sweeping summary judgment motion. The linchpin of Judge Lindsey's summary judgment motion was his interpretation, or in Jacked Up's view, misinterpretation of a single awkwardly worded one-sentence paragraph in the license agreement. I want to ask you about — there's a lot of questions here, so I want to — Of course. On the breach of contract, your reply brief makes what I think is a much better argument about the breach of contract, because the anniversary date is really just the five-year license term expiration. The argument you make in your reply brief, which is basically that it is every year that you can file this notice that you want to terminate, but it's only effective on the anniversary date. Correct. Two procedural questions about that. Did you adequately raise that before Judge Lindsey? And in your principal brief here is question one. Question two, if not, does it — when we're trying to find what is the plain meaning of the contract? Judge Costa, we're here on de novo review, question of law, interpretation of a contract. We have at all stages of these proceedings urged ambiguity. Ambiguity is the argument. That argument may be a little more refined on this question of law here in the Fifth Circuit than it was in the district court, but the argument — the basis, ambiguity, is the same, and we are here on de novo review, so I think we're well within our rights to argue a robust interpretation of this. So what about my first question? Did you advance that interpretation in any form in the district court? What we advanced in the district court, Your Honor, was Mr. Schmitz, the principal of Jacked Up. His understanding, his interpretation of Section 14b, which is in the record in his declaration and elsewhere, that was the understanding that he argued for. Now, Mr. Schmitz is not a lawyer. Once we took a look at this as an issue of law, I think we refined that interpretation, but the ambiguity remains. It's just ambiguity. The reply brief argument is that it's ambiguous. We should therefore remand for parole inquiry? Yes, Your Honor. We think that this Section 14b is ambiguous, which is a fact issue for a jury, for a number of reasons. First and foremost among those, Judge Higginson, is that Section 14b is at war with the rest of Section 14. And if you look at this provision, and I would invite you to turn to it in your record excerpts, it's tab 8, it's page 934 in your consecutively paginated record, or if you're going from tab 8, it's pages 6 and 7 in the record excerpts. You've got this five-paragraph termination section, Section 14, and it starts with Section 14a, which describes very carefully a termination for cause scenario, 90-day termination for cause window with an opportunity to cure. And then if you skip ahead to 14c, that continues this very in-depth discussion of termination for cause and how you unscramble the eggs. Now, and if you look at 14d, there's an accelerated termination mechanism of just 30 days in the event of a bankruptcy. I'm surprised you're not arguing under your refined argument, I'm surprised you're not arguing it's unambiguous in your favor, because your position is the defendant's argument that Judge Lindsey accepted renders 14b superfluous, and you say there's no logical reason for that 60-day carve-out unless the termination is effective on the anniversary date, in which case the 60-day carve-out allows people time to ramp down their operations, maybe look for other arrangements. It's sort of an advanced notice provision. Your Honor, I agree with you. I think, though, that our goal is to give meaning to each and every phrase, each and every provision in this contract. 14b should mean something. We just don't think it means what Judge Lindsey thought it meant and what Jack, what Smucker and Sarah Lee is going to argue that it meant. And I understand your position on ambiguity. If the 14b does have this incongruity of the 60 days, but it doesn't say that if proper notice, termination effective when, but the question would be logically on the anniversary, but you're saying it's not in the language. So let's say you're right, and therefore it's ambiguous as to that termination effective when. Can you point to any evidence, parole evidence that's in the existing record that shows that the parties did intend it to be that way? Well, I think we don't even need to go to parole. I'm just curious. Well, Mr. Schmitz's declaration. But Schmitz was saying it was effective on term. Right. Is there anywhere in the record that it's suggested that the parties thought that this was a somewhat plain vanilla, we give notice before 60 days, and then upon the anniversary? Is there anything in the record that indicates that? Annual termination. Your Honor, if you look at the e-mail exchanges between the parties as this is drafted, it really doesn't go into that kind of depth. And that's why I think this is ambiguity. That's why we've teed it up as an ambiguity, rather than saying, as Judge Costa suggested, that we win as a matter of law. I think there is an ambiguity here that requires parole evidence, because this just doesn't make any sense, Judge Higginson, as it exists within the framework of 14a. Think about it this way, Your Honors. Why would you need a 90-day termination period if you can cancel without, for cause, if you can cancel without cause for any reason or no reason at any time? Well, again, we'll hear what Sarah Lee has to say, but what if they just thought they were very perceptive and it was sharp dealing? It had negotiated the original one with the other portions of 14, as you point out, but then they decided they wanted an advantage, and both of you are mutually drafting this, and you acceded to it. Then I think that would reinforce and further strengthen our fraudulent inducement claim. It would, but isn't there a trouble with the fraudulent inducement as to damages if you've acknowledged elsewhere you're not seeking sort of reliance damages? Well, I think there is this entire period of pre-contractual, pre-license agreement damages, Judge Higginson, from April 2011 through the signing of this agreement on October 1st, 2011, when Jack Dup spent hundreds of thousands of dollars developing these products and at Sarah Lee's bequest hiring a marketing company to develop the trade dress. And on that theory, which makes sense to me, would you have a best case on fraudulent inducement that would be independent of whether there's a breach or not? Well, yeah. In other words, you saw the district court said, well, you couldn't rely on oral statements if ---- Well, Your Honor, I think that's one of those precepts that's so common under Texas law, I'll just have to stand on the cases on my brief. It's fraudulent inducement is a separate cause of action, particularly here where there's ---- I forget the authority that he cited when he said that wouldn't be a possibility. And let me direct you, Judge Higginson, because I think it speaks to this, to consecutively paginated record, page 936, which is under section 20, miscellaneous, subsection C, entire agreement. This is what passes for a merger clause in this contract, and it's not much of a merger clause, Judge Higginson. It reads, The agreement constitutes the entire agreement between the parties as to the subject matter hereof, and no modifications or revision thereof shall be of any force unless in writing. That's weak tea, no pun intended, weak tea and no crumpets. There's no disavowal of oral representations that were made in this 6-month pre-contractual period. It doesn't deal with the pre-contractual costs, hundreds of thousands of dollars of costs that jacked up incurred developing these products and developing their trade dress and developing the trademarks. And it doesn't, it in no way deals with that pre-contractual period. It's one of the weakest merger clauses I've ever seen. And to the extent that Judge Lindsey disposed of our fraudulent inducement claim because our reliance was unreasonable, I think he failed to analyze this, that this is not the sort of merger clause that explicitly disavows oral representations and gives fair warning to a smaller party dealing with a much larger, much more sophisticated party of not to rely on those oral representations. The only basis for Judge Lindsey disposing of our fraudulent inducement claim, as well as our contract claim, and as well as our tortious interference claim against Smucker, was his interpretation of Section 14b, which I would respectfully suggest is just not commercially reasonable, and particularly in light of the larger context of this contract where it's at war with Section 14a, at war with 14c, at war with 14d, and also — But the damages, they attack your lost profits — Yes. — damages model, saying it's a new product, that's unavailable. Putting that to the side for a second, are those the only damages you seek? What about reliance damages? Yeah. I think there's two distinct buckets of damages here, Judge Costa. The pre-contractual phase, or the pre-license agreement phase, from April 2011 to October 1, 2011, were jacked up, acting in reasonable reliance on Farrelly's promises, statements, and inducements, all of which are detailed in considerable detail in our pleading and then in the four years' worth of discovery that took place. Those pre-contractual reliance damages, business opportunities that we passed on, we didn't go — What about the Schmitt's deposition? When the attorney on your side interrupts and says the plaintiff has not made a claim for reliance damages, we've not set forth any expert opinion on reliance damages. Well, I think there's a difference between an expert opinion and we have a fraudulent inducement and a fraud claim that are seeking — Well, forget the second sentence. The plaintiff in this case has not made a claim for reliance damages. I'm not sure that a statement at a — I just disagree with that, Judge Costa. I'm not familiar with that passage in the deposition. But this is a pretty straightforward fraud and fraud inducement, classic bait-and-switch case, and that's how we pled it and that's how we would have tried it had we been given our day in front of a jury. And I think just an examination of the second amended pleading makes that pretty clear. But they relied on that. If the lawyer announced that we're not seeking reliance damages, and so based upon that, they didn't take any action with regard to that, now you're saying, well, he might have said that, but it didn't mean anything? Your Honor, that wasn't a basis for the district court's grant of summary judgment. If this Court goes with me today on the ambiguity of Section 14b, there's going to be a remand and there'll be adequate time to address damages on remand. We weren't on the eve of trial. This was not an eve of trial grant of summary judgment. And that just — Judge Prado, that's not a part of the district court's calculus here. And Judge Costa, as to the lost profits, their primary objection to the lost profits is this Illinois new business rule, so-called, that your colleagues on the Seventh Circuit have referred to as, I believe, a failed experiment. Its legal status is unclear to me. But more importantly, as a matter of law, this was not a new business. This is the third largest player in coffee and tea in America at the time of this transaction, entering into a license agreement for a new product as part of an existing business, a very robust — was it going to be a successful product or not? There were no stores yet that had been contracted to sell the item. Your expert's report says, oh, it would have been at so many stores and it would have sold so many cases. Where does that come from? Can we reasonably rely on that expert predicting how many stores were going to sell it and how much was going to sell at each store when it's a new product that has not been on the market? Well, Judge Frader, to me, that's a consummate fact issue for a jury. That's exactly what we need a jury to deal with. It could be a battle of the experts. And if at trial Judge Lindsay wants to exclude something as overly speculative or to disqualify an expert, we'll get to that in due course. But that's not what we're here about today. And that was not a basis for Judge Lindsay's grant of summary judgment. He did not grant summary judgment based on this lost profit business. That's a fallback argument and a tacit concession that 14b is ambiguous. Can this court affirm summary judgment on other grounds than those cited by the district court? As a procedural matter, it can, Your Honor. I would just suggest that that's a consummate fact issue and that a big part of our damages model would be Sarah Lee's own estimates, projections, thought process. Did you look at the Providence decision that they offer, which points out that the Janik report wasn't signed and that we have some law that suggests that it may not be admissible at the Rule 56 stage? Well, Your Honor, I would just say that Judge Lindsay didn't reach that issue. And it's just a consummate fact issue for him. Do you have any thoughts on that language in Providence? Your Honor, I apologize. I did not delve into that. There's a lot to cover here. Before my time expires, I want to point out one thing, and that's on page 618 of your record, Judge Lindsay's summary judgment opinion. The court agrees that the plaintiff has submitted evidence in the record that supports the claim for fraud, common law fraud. That's an extraordinary statement in an order granting summary judgment and dismissing that fraud claim. There was evidence in the record by Judge Lindsay's own analysis. He just didn't like the way we pled the fraud claim. So, unfortunately, and Your Honor, may I finish my sentence? Go for it. Unfortunately, for the other side, we were long past the 9B, 12B, 6 stage. At Rule 56, how you pled the claim doesn't matter. And I think Judge Lindsay recognized there was evidence but improperly conflated a summary judgment analysis with a 12B, 9B analysis, and that, too, is error. Thank you. One syllable, two syllables. I'm sorry, Your Honor? Your name? Schweigman. Two syllables. Okay. Two syllables. All right. May it please the Court. My name is Chris Schweigman, and I'm here today on behalf of Sarah Lee and the J.M. Smucker Company, the defendants in the underlying case. This case, as Your Honors are well aware, arises from a license agreement between Jacked Up on the one hand, Sarah Lee on the other. Shortly after the license agreement was signed, the Smucker Company acquired certain of the assets of Sarah Lee, decided for its own independent business reasons not to acquire the license agreement at issue. Shortly after that, the evidence is undisputed that Sarah Lee offered Jacked Up to perform the market test that's required by Section 7 of the license agreement. Mr. Schmitz testified in a corporate rep deposition that that was unequivocally offered to him by Sarah Lee, and he unequivocally and absolutely refused to engage in that market test, which is required by Section 7. As a result, rather than do the test, he sued, sought hundreds of millions of dollars in lost profit damages, and that's why we're here today. So that's your argument for why the other side breached? That's — well, that's right. Let me ask you first about this interpretation of 16 — 14b that you advanced and Judge Lindsay agreed with. Looking at — there's really two parts of that provision. It says either party shall have the right to terminate, and then it lists a condition if it provides written notice to the other side no later than 60 days prior to the anniversary of the effective date. The condition, if it provides written notice, I think there's no doubt that it's unambiguous, as you read it, that the notice to the other party can be provided within any year, because the anniversary is every year, but it just can't be provided 60 days prior to the anniversary date. The other 10 months, you can provide the written notice at any time. But it seems to me what's not directly addressed by the language is when the termination is effective. It says, because going back to the first part, since we — I'm agreeing with you on the second part of when the written notice has to be provided, either party shall have the right to terminate. Where in the contract does it say — does it directly address when the termination is effective? Clearly, Section 16b does not address that on its face. However, within the four corners of the contract, the Court can infer that the — that because of how other provisions are read, that this termination under 14b would be terminated immediately upon notice. The reason I say that is in Section 14a, the termination is effective 90 days if the breach is not cured. Within — and in 14b, if the Court looks at the extrinsic evidence that was provided, it was clear, and there's no dispute, that Sara Lee proposed 14b for the reason that — well, I guess there's no dispute that Sara Lee proposed 14b and explained to Jack Dup's lawyers that it wanted this provision in the event that the North American beverage is purchased by a third-party company, that Sara Lee wanted that right to get out of this contract in the event its assets were purchased by someone else. That's not inconsistent with Jack Dup's reading because, sure, if six months into the contract, Sara Lee sells its business, then it can get out, but at year end. Let me ask you this. Did Judge Lindsey go into this, what you call the four corners analysis and then even extrinsic evidence you're citing, to determine when the effective date of the termination would be? It seems to me he just sort of assumed the termination was effective immediately. Well, I guess, first, the short answer is no because in response to the question you asked during my colleagues' colloquy with the Court, the — Jack Dup didn't raise this issue until the reply brief, did not raise it at the summary judgment stage at all, and put all of its eggs in its basket that, well, you've got this anniversary only on the five-year anniversary and the following three-year anniversary. So this wasn't addressed. Now, I will say, however, that Judge Lindsey did address some of the extrinsic evidence in the context of passing on the fraud claim. So, for example, Judge Lindsey said, and he reviewed the evidence and found it's undisputed that Jack Dup proposed that term. It's undisputed that Jack Dup — I'm sorry, that Sarah Lee proposed that term, that Sarah Lee explained the reason for it, that is, it needed an out in the event its assets were purchased. And there was no dispute that Jack Dup understood that purpose and accepted and agreed to that provision. So from our perspective, there's no ambiguity in the contract itself. And in any event, even if the Court found some ambiguity with respect to that provision, no party has alleged that Section 7 in the market test requirement is ambiguous. And with respect to that provision, there's no dispute that Sarah Lee was obligated to facilitate a market test of these products. There's no dispute, and it comes from Mr. Schmitz's testimony, that that market test was offered. And there's no dispute that Mr. Schmitz, for his own reasons, refused to perform that market test. Back on 14b for a second. If you're right that this was not raised at all, the new, jacked-up, refined theory of the contract, does that bar us from considering it? Or I know in statutory interpretation, for example, the Supreme Court has said, you don't have to — you're not bound by the party's arguments because we're trying to figure out what Congress or a state legislature intended. Is it the same thing with a contract where we're just trying to look at the plain meaning of what the party's intended, or are we restricted by what the party's argued? What is de novo review? And I would say that I believe that that argument's been waived since it was raised first in the reply brief. In any event, under Illinois contract interpretation law, we don't get to ambiguity unless, I guess, a prerequisite to that analysis requires that the party asserting ambiguity propose a reasonable counterinterpretation than what's been proposed by the other party. And here, the only interpretation that ever was espoused was this argument that the anniversary was only — it only occurred every — once every five years. As a result, we don't think we get to the ambiguity question because that's the only court — that's the only provision that the court considered. That interpretation was the only thing the court considered in the underlying proceedings. My final 14B question, I promise. Can you give any logical reason, if it does mean termination is effective immediately, why there would be this 60-day carve-out when, on the actual anniversary date, you can cancel immediately? Sure. The — well, we know from the extrinsic evidence the reason it was requested. It was requested for the precise reason that occurred, that certain assets were acquired and, as a result, Sarah Lee chose to rely on that provision among the Section 7 termination to get out of that contract. But, Your Honor, if you look at Section 6, just staying within the four corners of the room, if you look at Section 6A, for example, Section 6A of the contract requires the parties to meet yearly to talk about how they're going to market the product the following year. So it makes sense that the parties would carve out a two-month period to allow them to assess the prior year and plan for the next. And that was a contractual requirement that's in 6A. Now, to be sure, if the results of that marketing meeting didn't satisfy either of the two parties, either of the two parties could terminate immediately in the following year. But this sort of two-month what I'll call cooling-off period allowed the parties to do some work that was required to allow them to evaluate their business and decide if they wanted to continue. So there's evidence in the four corners of the contract that helps explain why 16B would have that two-month carve-out. In any event, even if the Court were to interpret, or I should say find ambiguity in that 14B section, again, no one's ever argued that Section 7 of the market test requirement is ambiguous. And the evidence is very clear that Sarah Lee terminated also not just in accordance with 14B, but also in accordance with Section 7. And again, the Court need look no further than Jack Duff's own corporate representative deposition to find that Sarah Lee made the offer and Mr. Schmitz refused it for his own reasons. Both of you today has been there two ways to look at 14B, at will immediate or at will on anniversary. We sort of, for the moment, I'm not saying I speak for the panel, put aside the principle brief notion of at term. But if it's your argument, at will immediate, wouldn't that enhance the actionability of their fraudulent inducement claim? No. Judge Lindsey dismissed the fraudulent inducement claim in part because of the contemporaneous extrinsic evidence that explained the purpose for 14B. Judge Lindsey held that Sarah Lee explained the basis for 14B to Jack Duff. I should say to Jack Duff's competent legal counsel at Fish and Richardson, and that with that explanation, Jack Duff accepted that provision anyway. Put differently, Judge Lindsey held that. I thought Judge Lindsey said it depends on us concluding that the language is unambiguous, that the party can't rely on oral statements if the contract is unambiguous. So we'd have to accept your proposition. I guess that's correct. Yeah. I think that's right. And we maintain, obviously, that the language in 14B and Section 7 plain and unambiguous. But I would just, to further answer your question, Your Honor, even if the 14B is ambiguous again, and I hate to reemphasize this, but Section 7 says that the termination is effective 30 days after the completion of the market test. So, again, putting aside 14B entirely and whether it's ambiguous or not, to answer your question as it relates to fraud. Remind me, though, did Judge Lindsey spell that theory out, that what we're really talking about is a violation of the market and, therefore, termination effective? Did he develop that in the order? He did not. We did. The defendants did in our summary judgment motions. He did not reach that. But as Judge Prado mentioned earlier, the Court can affirm on any basis in the record, even one not passed on by the district court. What's your best case that fraudulent inducement wouldn't lie here? What's your best Illinois case? There are a number of Illinois cases cited. It would help me to know the one you think is the most on point. Yeah. I can't name for you an Illinois case. I can name a number of Texas cases that Judge Lindsey relied on, and then there's a footnote in our brief where we say the law in Illinois is the same. In fact, the same footnote appears in Judge Lindsey's opinion, that he outlines a number of Illinois cases. I apologize for not giving you that now. If it's necessary, I'm happy to provide that. One of the cases that we rely on is a case written by Judge Costa, the case involving the Asian-Japanese beef, where when you're on the district court, Judge Costa held that even if the oral representation doesn't directly contradict a provision, that a party can't rely on a statement that, well, we're not going to enforce the contract. And the same is true here in a sense. The representations that the plaintiff relies on are representations that we're not going to terminate, we're not going to exercise these termination provisions, we're going to keep this going long enough to recoup our expenses year after year. That directly contradicts Section 7, which says it's a 5-year agreement subject to the other termination provisions. Did Sarah Lee tell Jacked Up in October that Sarah Lee would follow through with the licensing agreement? Not in those words, but after the Smucker transaction. And again, Smucker only acquired certain assets, not all of them. And the folks that remained at Sarah Lee picked up the phone, called Jacked Up and said, we'd like to perform this market test to install the equipment, do the things that are required under Section 7. So the short answer is yes, Your Honor. We, Sarah Lee did say it would perform the market test, and it was only after that Jacked Up said no and sued us did we send the notice of termination that was in accordance with both 14b and Section 7. I'd like to say a few words about damages. The Jacked Up is seeking, or at least has stated in this case, it's only seeking lost profit damages. That's it. There are no reliance damages. Counsel for Jacked Up unequivocally disclaimed any right or said it was not going to seek those kinds of damages. And to be sure, defendants relied on that. When it submitted an expert report in this case, it only included lost profit damages. There were no representations about reliance damages. There were no representations about these hundreds of thousands of dollars in reliance expenses that we're hearing about for the first time today. The expert report only dealt with lost profits, and we've argued that those lost profits are not available under the Illinois New Business Rule. We've also argued that those lost profits aren't available under Texas law because they're too speculative, and more importantly, they're not supported by competent evidence. At the summary judgment stage, your argument on damages, which wasn't reached by the district court, rests on three components. One, as to reliance damages, the concession. As to consequential damages, either as a matter of law, new business rule, or even if there are exceptions, they didn't make their fair probability showing. That's essentially your construct? That's right. I'd add a fourth, Your Honor, which was that the summary judgment record had no evidence of damages. The only evidence in this — To me, it all comes down to that JANIC report and whether there's authority for us to essentially make a do-bear finding that it's not reliable or admissible. Otherwise, it's a big chunk of predicted consequential damage. It is, and it's un — it's inadmissible for the simple reason that it's not verified, it's not signed, and it's unsworn. And the Fifth Circuit law, and certainly the law in the Northern District of Texas, is that an unsworn, unsigned expert report is not admissible. And it should be noted that we've — Is it may not be admissible or it's not admissible? It's not admissible because it's hearsay, Your Honor. It's — Isn't that the type of thing where a district judge ruling in the first instance might say, inadmissible, but I'm going to let you file a corrected one? Well, what's interesting, Your Honor, is we filed, in addition to a motion for summary strike, that expert report because it was — it was not signed or verified. That, in my view, is an easy fix. Under our local rules, there's 21 days to file a response, and during those 21 days, JACTA could have very easily supplemented the summary judgment record to include a — That motion was never ruled on, right? That motion was never ruled on, and the court, as you pointed out, never reached this issue of damages. But again, I'd fall back and say that for a — the court can rely on any fact that's in the record, and it's very easy to look at the summary judgment record and see that that expert report, which, again, is the only evidence of damages in the record, is both unsigned and unverified. And under Fifth Circuit precedent and precedent in the Northern District of Texas, that is inadmissible as a matter of law. Judge Prado was pointing out our law is a little bit more discretionary on that point. So then you have this alternate argument about hearsay. But if it's an expert opinion, no one's really tested whether it contains hearsay or not. Well, it's hearsay because it's a — it's just — it falls within the definition of — the rule definition of hearsay. It's an unsworn statement that's made out of court that it was attached to a summary judgment record. It's not — it lacked all of the requirements of an affidavit, for example, that would make it admissible or even, for that matter, a declaration where the expert would have said that it was based on his personal knowledge and the contents are true and correct. And that's obvious from the face of it. And the best circuit case that we would decide this in the first instance at the circuit level is what? That is Provident Life, 274, Fed Third, 980. And that's the case that all three of us are sort of interrupting saying it's discretionary. Well, we'd ask that the Court exercise its discretion here and exclude that evidence. And, again, for two reasons. One, because it's obvious on its face that it doesn't meet the sort of threshold requirements for admissibility. There's no additional fact-finding that's necessary. The Court can simply look at the expert report and see it doesn't satisfy either the requirements for an affidavit or a declaration. They represent that most of it's sort of based on Sarah Lee. Right. Now, this issue also wasn't raised before the district court, but it bears noting that that expert, and this is spelled out in the Daubert motion that we filed in the lower court, that to be sure some of the information in there is based on a pro forma prepared by Sarah Lee. What's important for the Court to understand is that Sarah Lee actually performed close to ten pro formas at various different tolerances and risk levels of how they thought this would run. That expert chose among the various ten it could have chosen from, it chose the one that Sarah Lee's internal people called the gangbusters pro forma, the one that assumed everything went right. From that gangbusters pro forma, this expert then increased the gangbusters by a number of percentages. I believe it was 20, 40, and 60 percent, thinking they would do even better than Sarah Lee ever expected. And, again, those reasons are spelled out in the Daubert motion, which the Court denied as moot in light of the summary judgment opinion that it granted. Unless there are questions about the other causes of action, Your Honor, I'd rest on the briefs and the well-reasoned opinion Judge Lindsey issued in this case. Thank you for your time. What's happened to the Infusion line? Is that still going? Infusion was a brand of iced tea that Sarah Lee marketed and sold well before it met Jacked Up. It had its own vitamin mix. Put differently, Your Honor, it had its own formula. When Sarah Lee acquired certain of those assets we talked about, Smucker acquired the Infusion teas, and those are still being marketed today. And what's significant about that is the Smucker Infusion teas use the exact same formula, which is in the record, it's in the sealed portion of the record, that Sarah Lee used well before it met Jacked Up. So to the extent that Jacked Up argues that Smucker took a trade secret, this is one of those rare trade secret cases where you can tell directly in the record  because we have the formula that existed before we met Jacked Up, and we have the formula that's being marketed and sold today. And as the Court can see by looking at the sealed record, the formula is the same. And more importantly, it's not the same as the formula that Jacked Up provided to Sarah Lee. For all those reasons, Your Honor, we'd ask that you affirm the district court. Thank you. May it please the Court. Just a couple quick thoughts in rebuttal. First, I'll pick up where I left off, which is with Judge Lindsey's acknowledgment that, quote, the Court agrees that plaintiff has submitted evidence in the record that supports its claim for fraud. And the word record is emphasized on page 618. I didn't hear anything from counsel opposite about, I think, the very clear procedural error that Judge Lindsey made in applying a 12B, 9B standard at the Rule 56 stage. I think that alone on the fraud claim, with that extraordinary acknowledgement on the face of his order that there is evidence to support the fraud claim, warrants reversal and remand. As to Section 7 of the license agreement, I'm actually glad that my colleague raised that because I think it's further evidence of the ambiguity of Section 14B. Because just as Section 14B wars with 14A, 14C, and 14D, it also wars with this testing period termination term in Section 7, that there is at the outset of the contract a testing phase that if the results don't go as thoroughly hoped after best efforts and in reasonable determination, then there's an ability to cancel without penalty. Well, again, what sense does that make if 14B is interpreted as Judge Lindsey did, where it's an all-purpose, no-fault, anytime-you-want termination clause? Not only would that reading of 14B negate 14A, 14B, and 14C, it would also take out about half of Section 7, the termination clause. As to their argument that it was jacked up that breached first, that, too, is a consummate fact issue. Indeed, when I do my presentation on jury charges, who breached first is the question I use as the very example of a jury charge. They're saying we breached, we think they breached first, and I think if Your Honors think about the circumstances of this breach, where it's a small company that thinks its ship has come in with this eight-year license agreement with the third-largest player in coffee and tea in North America, the last thing we're wanting to do is breach. We had a good faith and reasonable belief that they breached first, and if they want to argue that we breached first, let's take that up with the jury. And certainly Judge Lindsey did not reach that in his summary judgment order. And again, the circumstances of this breach, because I think the timeline is important here, Your Honors, jacked up scrambles madly from April 2011, when they first have contact with Sara Lee, to October 1, 2011, to put these products together, to get them ready for market, and most importantly, to have them make their debut at this National Association of Convenience Stores trade show, the largest trade show of its kind in Chicago, October 1 through 4. So when a couple days before that huge trade show starts, which has been the goal all along, to debut these products at that trade show, the larger, more sophisticated party shows up and says, hey, we'd like to insert this weird little two-line provision into this contract, 14B. They have all the leverage. They have the bargaining power. It's either ambiguous or it's a fraudulent inducement, because again, there's evidence in the record from Mr. Schmidt and others that this was accompanied by statements from Sara Lee, oral statements, that they weren't going to be selling the beverage business anytime soon, that there was no sale in the works. All of that was false and they knew it. This transaction with Smucker did not brew up, no pun intended, overnight. It was a multi-month process. They knew it. They never disclosed it. They snuck this 14B, this weird, sloppily drafted, sloppily drafted by them, provision into the contract. Roberts. Given that story, which is a compelling one that Jack Dup wouldn't have breached, whether we conjecture as to it or not, and you're acknowledging it's a weird little thing they muscled in at the end, then the inconsistency with the other provisions isn't really making anything ambiguous. It's just that they put in something that was very favorable to them. And at that point, your damages would, in my thinking, reduce to the fraudulent inducement claim. In other words, they would have put in a provision that's very favorable to them that you acceded to. Well, I think it's a nonsense provision when interpreted in the larger contract. But you've just said they muscled it in as a weird little outsider that really doesn't harmonize with the rest. It gave them the escape clause, but you both had counsel. And, well, we had a trademark attorney, not corporate counsel, for what it's worth, but a trademark prosecutor. And, again, if you look at the e-mail exchanges in the record, these are not sophisticated – on our side, corporate attorneys doing sort of corporate-style drafting. Your Honor, may I complete my answer to your question? That at the end of the day, this is either ambiguous or it's fraudulent inducement. We've argued both. We'd like our day in front of a jury on both. Thank you, Your Honor. Thank you both.